Steven GENTILE, Plaintiff,

v.

Kevin A. NULTY, Individually and as Chief of Police of the Town of Orangetown, and Town of Orangetown, Defendants.

No. 99 CV 11521(CM).

United States District Court,
S.D. New York.

May 22, 2001.

Maureen McNamara, New City, NY, for Plaintiff.

Joseph Maria, White Plains, NY, for Defendants.

MEMORANDUM DECISION AND OR-
DER DENYING DEFENDANTS'
MOTION TO DISMISS AND MO-
TION FOR SUMMARY JUDG-
MENT AND ORDERING DEFEN-
DANTS TO ADDRESS ISSUES
RELATING TO LIABILITY

McMAHON, District Judge.

Plaintiff, Police Officer Steven Gentile ("Gentile"), filed the instant complaint against his employers, Defendants Kevin A. Nulty ("Nulty"), individually and as Chief of Police, and the Town of Orange-town ("Orangetown") under 42 U.S.C. § 1983, alleging that Defendants deprived him of his rights under the Fifth and Fourteenth Amendments of the U.S. Constitution and under § 207–c.1 of the New York General Municipal Law. Gentile claims Defendants have continually denied him workers' compensation benefits to which he is entitled in retaliation for legal

action taken by Gentile to secure those benefits. Defendants move for "dismissal and/or summary judgment" on the grounds that they have lawfully denied only those benefits to which Gentile waived his rights. (Aff. of Joseph A. Maria in Supp. of Mot. to Dismiss and/or Summ. J. ("Maria Aff.").)[1]

This case revolves around Gentile's claims for reimbursement for medical treatment necessitated by two work-related injuries.[2] Defendants challenge neither the work-related nature of Gentile's injuries nor the appropriateness of the treatment he sought for them. Indeed, Defendants admit that Gentile is eligible for workers' compensation benefits. However, Defendants assert that Gentile's practice of paying doctors himself and submitting receipts to Defendants for reimbursement constitutes a waiver of Gentile's rights with respect to those specific claims—e.g., all the claims that have been denied.

Two issues are presented by Defendants' motions: (1) whether Gentile's departure from the payment procedure outlined in the statute constitutes a waiver, and (2) whether Defendants have preserved their right to challenge liability. I

find that Gentile has not waived his right to reimbursement and further that Defendants have not preserved their right to challenge liability on the grounds they assert in this lawsuit. Thus, not only must Defendants' motions be denied, but I may well have to grant summary judgment to Plaintiff on the issue of liability. I cannot decide that without giving defendants an opportunity to address the matter.

## FACTUAL BACKGROUND

Except where noted, the following facts are undisputed. On June 18, 1993, Officer Gentile was involved in a shootout with suspects to a bank robbery in Pearl River, New York. (Compl.¶ 9.) As a result of the incident, Gentile suffered post-traumatic stress disorder (the "first injury") which caused him to be absent from work. (Id. at ¶¶ 9, 12.) Defendants acknowledged that the first injury was work-related and that Gentile was entitled to compensation under New York General Municipal Law § 207–c.1, governing salary and workers' compensation benefits for police officers injured in the line of duty.[3] (Id. at ¶ 10).

▮ Defendants also acknowledged that the psychological treatment sought by Gentile for his post-traumatic stress was

---

**1.** Documents were submitted in an utterly unprofessional fashion; reference to documents by exhibit is not possible here.

**2.** Defendant Orangetown opts to cover its police officers under a workers' compensation plan and is self-insured for that purpose. During the period at issue in this case, Orangetown switched workers' compensation claims administrators several times: from Precise Claim Administrators, to Craig, Lindsay Associates, and finally to Gallagher Bassett (collectively, "claims administrators"). None of these firms is named in the present suit; therefore only Defendants' denials are at issue. The record reflects that Gentile submitted claims to Defendants and also to the claims administrator, and was at times denied benefits by both.

**3.** § 207–c.1 provides in part:

> Any ... member of a police force of any ... town or village ... who is injured in the performance of his duties or who is taken sick as a result of the performance of his duties so as to necessitate medical or other lawful remedial treatment shall be paid by the municipality by which he is employed the full amount of his regular salary or wages until his disability arising therefrom has ceased, and, in addition *such municipality shall be liable for all medical treatment and hospital care necessitated by reason of such injury or illness.* N.Y. Gen. Mun. Law § 207–c.1 (emphasis added).

necessitated by his work-related injury.[4] Accordingly, Gentile's visits to psychiatrist Peter Kroetsch, M.D. ("Kroetsch") for psychotherapy were covered by workers' compensation. Gentile returned to active duty with the police department "towards the end of 1993". (Compl.¶ 12.)

On December 31, 1995, approximately two years after he returned to work, Gentile was assaulted by a suspect during a motor vehicle stop, sustaining human bites and injuries to his knee, left shoulder, lower back and right elbow (the "second injury"). (Id. at ¶ 12). Orangetown again acknowledged the work-related nature of these injuries and Gentile's right to receive benefits under § 207–c .1. (Id. at ¶ 13.) The record is clear that the second injury not only caused new physical injuries, but also exacerbated Gentile's post-traumatic stress from the first injury. It is uncontested that both of these conditions persist to the present day, although Defendants do not expressly admit that the post-traumatic stress has been continuous.[5] (Id. at ¶ 14.) The parties agree that Gentile's current treatment for the second injury consists of psychotherapy with Kroetsch, medication prescribed by Kroetsch, visits to orthopaedist Louis M. Starace, M.D. ("Starace") for physical therapy, and medication prescribed by Starace. Defendants do not dispute that Gentile's treatment under Kroetsch and Starace is (and has been) causally related to and necessitated by the second injury. Defendants also have not raised the issue of the cost of treatment.

Gentile admits that he has consistently paid Kroetsch and Starace directly, submitting his receipts to Defendants for reimbursement. In fact, he argues that he "always" submitted his bills this way. (Letter from McNamara to Nulty of June 23, 1999.) His practice of paying doctors directly constitutes a departure from the procedure of § 207–c.1, which states that a provider "shall not collect" payment from the patient-beneficiary (the "collection clause").[6] N.Y. Gen. Mun. Law § 207–c.1. Notwithstanding this procedural departure, Defendants reimbursed Gentile for his payments to Kroetsch and Starace until some unspecified date prior to 1997.[7] (Id. at ¶ 16.)

In 1997, Gentile filed suit in the Southern District of New York alleging that Defendants had effectively terminated his § 207–c.1 benefits without a proper hearing (the "first suit"). (Compl.¶ 16.) Gentile alleged that Defendants were retaliat-

---

4. Psychological treatment that is "necessitated by reason of an injury incurred in the performance of a police officer's duties" is covered by § 207–c.1. *Kalb v. Wood,* 38 F.Supp.2d 260 (S.D.N.Y.1999) (quoting *Miller v. City of Poughkeepsie,* 185 A.D.2d 594, 586 N.Y.S.2d 396, 398 (N.Y.Sup.Ct.1992)).

5. Kroetsch's comments on workers' compensation evaluation forms indicate that Gentile has been treated by him continuously since 1993 for post-traumatic stress.

6. The portion of § 207–c.1 pertaining to collection of payment for services provides:

Notwithstanding any provision of law to the contrary, a provider of medical treatment or hospital care furnished pursuant to the provisions of this section shall not collect or attempt to collect reimbursement for such treatment or care from any such policeman . . .

7. Gentile's method of payment for prescriptions is less clear. The record shows that he at times used his own private insurance card to obtain prescriptions because his workers' compensation benefits card did not work. On these occasions, Gentile submitted receipts for his co-payments—not the full amount charged to his insurance—to Defendants for reimbursement. Defendants denied an unspecified number of these types of claims, despite the apparent reduction in cost to them as a result of the private insurance carrier's contribution

ing against him for obtaining a court order earlier that same year declaring his entitlement to workers' compensation benefits and compelling Defendants to pay. (Id.) Details about that court order are not in the record. However, the parties agree that Gentile prevailed in the first suit and that a jury awarded him compensatory and punitive damages against Nulty for the latter's failure to pay Gentile's medical expenses.[8] Defendants "admit" the complaint's averments, averring that Nulty was held liable to Gentile for compensatory and punitive damages, and that a retaliatory motive had been pleaded. (Id.¶¶ 16, 17.) The punitive award suggests that the jury did find Nulty's actions to be retaliatory. However, my decision on the instant motions is based solely on the record before me, which does not include a copy of the jury's verdict in the first suit. There is no mention of payment procedure in the record before me as a defense proffered by Defendants in the first suit.

The first judgment was rendered on February 23, 1999. (Id. at ¶ 17.) Two days later, and without giving a specific reason, Orangetown's claims administrator wrote to Gentile that he was unable to process plaintiff's request for reimbursement for "out-of-pocket" medical expenses—a claim that included Gentile's payments in full to Kroetsch and Starace, as well as payments for prescriptions and travel expenses. (Letter from Whaley to Gentile of Feb. 25, 1999.)

In March 1999, Gentile settled with Nulty, relinquishing any claim to punitive damages.[9] (Compl. at ¶ 18.) According to Gentile, he settled for less than the full award in the hope that he could mend his relationship with Nulty and eventually return to work for the department—a statement Defendants deny. (Id. at ¶ 19.)

On March 23, 1999, Judge Frendel issued a Notice of Decision for the State of New York Workers' Compensation Board with regard to Gentile: "Carrier ['Rockland County Self Ins. Plan' for employer 'Town of Orangetown'] to pay all causally related medical bills [for Gentile]." (Not. of Decision, Workers' Compensation Board, Mar. 23, 1999.) This determination comports with consistent evaluations of Gentile's disability as "total" and "possibly permanent." (Attending Doctor's Reports (Kroetsch), State of New York Workers' Compensation Board, from Sept. 8, 1998 through Apr. 27, 2000); see also Followup Office Visit Workmen's Compensation July 7, 1999 (Starace); Letter from Starace to "Whom It May Concern" of Apr. 30, 1999 (stating physical therapy for Gentile is medically necessary) ("Letter of Medical Necessity").[10] Judge Frendel's decision did not indicate how Gentile's "causally related medical bills" were to be submit-

---

8. Defendants "deny" the several allegations of paragraph fifteen of the complaint, which reads in part:
 "Despite the fact that all physicians agreed that the Plaintiff was disabled from the performance of his duties since the incident of December 31, 1995, the Defendant [sic] removed the Plaintiff from the benefits of Sections [sic] 207-c ..., and threatened to stop paying the Plaintiff his salary, forcing the Plaintiff in 1997 to obtain a Court Order declaring that the Plaintiff was entitled to the benefits ..., and directing that Plaintiff receive the benefits ..."

(Compl.¶ 15.)

9. The record does not indicate the exact date of the March settlement.

10. Starace's report of July 22, 1999 makes reference to a claim for coverage of Gentile's physical therapy that was denied despite the provision of a letter of medical necessity. (See "Followup Office Visit".) Defendants have not rebutted any allegations of denied claims.

ted, it only ordered that they be paid. (See id.)

The record indicates that Defendants did not pay any of Gentile's claims from February 1999 to November 1999. Although many of Defendants' requests for information from Gentile during that time are not in the record, the following correspondence indicates that Defendants led Gentile to believe that Defendants needed more information about his treatment before Orangetown could process his claims:

I. *Letter from Gentile to claims administrator of May 15, 1999*, referring to Defendants' obligation to pay medical expenses under Judge Frendel's order. In the letter, Gentile indicated that his unpaid bills dated back to September of 1998, and that reimbursement should go "directly to me, like your company has done in the past." (Id.) Gentile stated that a letter from Dr. Starace "requesting authorization for physical therapy" was enclosed. (Id.) Starace's letter closed: "I assure you that as soon as the therapy is no longer indicated, the patient will be discharged to an independent home exercise program. I hope the above information is useful to you. If there is *any further information you require,* please do not hesitate to contact me." (Letter of Medical Necessity of Apr. 30, 1999) (emphasis added). Since there is no response from Defendants contradicting these statements, I will infer that (1) Defendants reimbursed Gentile's medical expenses for some period of time, (2) that a letter of medical necessity was requested before Defendants would agree to pay (or continue to pay) for Starace's physical therapy, and (3) Gentile provided that letter.

II. *Letter from Gentile to claims administrator of May 16, 1999*, inquiring whether the reimbursement rate for travel expenses (for medical visits) had changed from the amount designated "in the past" of 37.5 cents per mile (travel and pharmaceutical receipts enclosed). Gentile stated in the letter that there were "no new medications listed here in [sic] which have not been accepted by compensation, and in which I have not received reimbursement for in the past." (Id.) According to this letter, Gentile had not been reimbursed for the cost of medication or travel in the past year. Again, since there is no communication from Defendants in the record refuting Gentile's statements, I will infer that Defendants reimbursed Gentile for medications and travel for some time, but not in the past year. There is nothing in the record at this point to indicate why Defendants stopped these payments—and there is certainly no mention of Gentile's payment method.

III. *Letter from McNamara to Nulty of June 10, 1999*, referring Nulty to the enclosed authorization for the release of Gentile's medical records for treatment with Kroetsch. The letter is addressed to Nulty, but there is a fax cover sheet attached addressed to Defendants' attorney, Richard Glickel ("Glickel").

IV. *Letter from McNamara to Nulty of June 23, 1999*, referring to Nulty's request for an authorization for the release of medical records. According to this letter, she and Gentile met first with Nulty on October 5, 1998, and then with the claims administrator shortly thereafter, to discuss the delayed processing of Gentile's claims for reimbursement. (Id.) The letter states that McNamara and Gentile were "assured that the problem would be straightened out, and that Officer Gentile would be promptly reimbursed in the future." (Id.) This letter includes a reference to a February 1999 communication from the claims administrator to Gentile in which the administrator allegedly objected to reim-

bursing Gentile directly. (Id. at 2) *This is Defendants' first reference to Gentile's departure from payment procedure.*

This particular letter also indicates that the claims administrator gave another reason for failing to reimburse Gentile— Dr. Kroetsch's failure to fill out "C–4" forms. However, it appears that Dr. Kroetsch did fill out the forms, and Gentile still was not reimbursed. Finally, the letter refers to the fact Gentile was repeatedly required by Defendants to submit copies of the same bills for their review. (Id.) According to this letter, Defendants changed their position on Gentile's claims four times: (1) they reimbursed him; (2) they stopped reimbursing him but assured him that he would be reimbursed shortly; (3) they told him he was not being reimbursed because his claims were improperly submitted; (4) they told him his claims were not being processed because authorization was required from Kroetsch.

V. *Letter from Glickel to McNamara of June 29, 1999,* referring McNamara to case law in support of Defendants' right to require the release of medical records for the purpose of providing workers' compensation. According to Glickel, the release forwarded to him by McNamara on June 12, 1999 was "obviously unacceptable," but that the revised copy would suffice. (Id. at 2.) Glickel also reminds McNamara that it is improper for medical providers to collect payment directly from the patient. (Id.) Glickel distinguishes Gentile's situation from one in which the patient would be required to seek treatment with a provider chosen by the municipality. Finally, he asks McNamara to obtain a re-

lease for Starace's records on Gentile. This letter from Glickel contains three separate explanations for Defendants' failure to process Gentile's claims: (1) unacceptable authorization for release of Kroetsch's records; (2) departure from statutory payment procedure; and (3) lack of authorization for release of Starace's records.

VI. *Letter from Nulty to McNamara of Sept. 1, 1999,* responding to a letter from McNamara regarding Defendants' utter failure to reimburse Gentile's claims for over a year: "I was under the impression that the [claims administrator] resolved this matter, and evidently it was not." (Id.)

VII. *Letter from Nulty to McNamara of Sept. 29, 1999,* responding to yet another inquiry by McNamara: "Please have officer Gentile make an appointment to meet with me at his earliest convenience so we can review in greater detail the problems he is having regarding the administration of his 207–C G.M.L [sic] benefits." (Id.)

Gentile filed the instant Complaint on November 23, 1999. In December, the claims administrator wrote to Kroetsch and advised him not to accept payment from Gentile anymore. (See Letter from Gallagher Bassett to Kroetsch of Dec. 2, 1999.)

In January 2000, Defendants reimbursed Gentile for "medical expenses" and "prescriptions" from November 1999 through January 2000 in the amount of $2,084.75. (Checks from Gallagher Basset to Gentile of Jan. 28, 2000 and Feb. 22, 2000.) [11] The following June, the claims administrator advised Gentile that he had already been warned not to pay his doctors

---

**11.** There is no evidence in the record that Defendants made any payments to Gentile or

his doctors between 1997 and 2000.

and that he would not be reimbursed for direct payments any more: "This is the way Workers Compensation works, the doctor bills the insurance directly." (Letter from Gallagher Bassett to Gentile of June 22, 2000.) The warning referred to was contained in the December 1999 letter *to Kroetsch;* there is no evidence a copy of the letter was sent to Gentile at that time.

Throughout the period in question, Gentile was unsuccessful filling his prescriptions using the benefits card provided to him by the claims administrator; he used his own private insurance card. (See, e.g., Letter from Gentile to Gallagher Bassett of Dec. 3, 1999 .) In February 2000, Nulty responded: "There should be no problem in the future, because Gallagher–Bassett has given you a prescription card for your medications." (Letter from Nulty to Gentile of Feb. 14, 2000). On February 22 and again on September 9, 2000, Gentile advised Nulty that his benefits card was still being denied at the pharmacy. (Letters from Gentile to Nulty of Feb. 22, 2000 and Sept. 9, 2000.) MacDonnell responded, referring Gentile to a memo sent by Mac-Donnell to Gallagher Bassett asking them to look into the problem. (Letter from MacDonnell to Gentile of Sept. 14, 2000 (referring to Memo from MacDonnell to Gallagher Bassett of Sept. 14, 2000).)

The other issue raised by Gentile at this time concerned an overpayment by the Town at the time checks were issued to Gentile in early 2000. Gentile made a mistake and reported his mileage twice; he reported his mistake to Nulty on February 3, 2000 and sent a check to correct the overpayment in the amount of $614.25. (See Letter from Gentile to Nulty of Feb. 3, 2000.) On receipt of the check, Mac-Donnell suggested that Gentile instead pay the difference between the overpayment and what the Town owed him for subsequent claims, or $33.40. (See Letter from MacDonnell to Gentile of Feb. 14, 2000.) MacDonnell returned Gentile's check of $614.25 at that time. (Id.) On February 27, Gentile sent a check to Nulty in the amount of $33.40, as agreed. (See Letter from Gentile to Nulty of Feb. 27, 2000.) This check also was not cashed. In September, MacDonnell responded to Gentile's inquiries: "As to the check, I should have forwarded it to our Finance Department, but did not. It was in my file. I am returning it to you and ask that you issue a new check." (Letter from MacDonnell to Gentile of Sept. 14, 2000.) Although the amount of money involved is so small as to seem inconsequential, the Town's frustration of Gentile's attempts to straighten matters out emerges as a pattern.

The overpayment negotiations occurred over roughly the same period of time as Gentile's difficulty with his prescription card and Gallagher Bassett's first complaints about Gentile's payment habits— e.g., immediately after Gentile filed this Complaint. With respect to the overpayment and the prescription card, the Town's responses to Gentile were essentially the same: you should have a working prescription card (but you don't), we should have cashed your check (but we didn't). Defendants never attempted to explain these failures.[12]

## DISCUSSION

A motion for summary judgment should be granted only if "the pleadings, deposition, answers to interrogatories, and admissions on file ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judg-

---

12. In fact, while Gentile was attempting to reimburse the Town for the overpayment, he continued to submit claims for subsequent failed prescription coverage; these claims appear to remain outstanding. (See, e.g., Letter from Gentile to Nulty of Sept. 21, 2000.)

ment as a matter of law." Fed.R.Civ.P. 56(c); *Kalb,* 38 F.Supp.2d at 266 (citing *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir.1996)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on a motion for summary judgment, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, to defeat summary judgment, the non-moving party must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When a motion for summary judgment has been made by one party, both parties are on notice that "ultimate issues are before the court." *First Financial Ins. Co. v. Allstate Interior Demolition Corp.,* 193 F.3d 109, 115 (2d Cir.1999). It is therefore within the court's discretion to grant summary judgment *sua sponte* in favor of the non-moving party without giving notice of its intention to do so. *See Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991); *First Financial,* 193 F.3d at 115. Such an action is warranted where the adversely affected party would be "unable to enhance the evidence" refuting the court's conclusion. *Ramsey v. Coughlin,* 94 F.3d 71, 74 (2d Cir.1996). Furthermore, in the event that the court's decision is based on issues "identical to those raised by the moving party," failure to provide an opportunity to respond is not reversible error. *Coach Leatherware,* 933 F.2d at 167.

 It has been established that the provisions of New York General Municipal Law § 207–c are to be liberally construed in favor of injured police officers, *see*

*Crawford v. Sheriff's Dept.,* 152 A.D.2d 382, 548 N.Y.S.2d 734 (2d Dep't.1989); *Uniform Firefighters of Cohoes v. City of Cohoes,* 258 A.D.2d 24, 692 N.Y.S.2d 750 (3d Dep't 1999), and that a police officer who sustains injuries in the line of duty becomes statutorily invested with benefits, which may not be terminated by the municipality for the purpose of avoiding the obligation to provide them. *See Ross v. Town Bd. of Town of Ramapo,* 78 A.D.2d 656, 432 N.Y.S.2d 229 (2d Dep't 1980). It is also clear that where a police officer has qualified for workers' compensation benefits, a municipality is liable for all "causally related medical bills". *See Schneider v. Lando,* 113 Misc.2d 112, 450 N.Y.S.2d 1017, 1017–18 (N.Y.App. Term 1982).

I. Plaintiff Has Not Effected a Waiver of His Right to Worker's Compensation Payments

 Defendants in the instant case hang their hats on a technicality. They do not dispute Gentile's entitlement to benefits, but instead argue that he waived his rights when he paid his doctors directly. According to the statute, there are two ways a police officer can waive his right to benefits: (a) by refusing to accept treatment, or (b) by refusing to submit to medical examinations. N.Y. Gen. Mun. Law § 207–c.1. Defendants have not argued that Gentile refused treatment or refused to submit to examinations. Therefore, he did not waive his right to benefits. While it may be the case that Gentile's doctors violated the provision in the statute regarding *their* obligations not to accept payment from the patient, Gentile has not failed to meet *his* obligations in any way that would qualify as a waiver. There is no need to look beyond the language of the statute to dispose of defendants' argument.

Even if the statute were not strictly construed against the municipality, Defen-

dant's waiver argument still falls short. Workers' compensation is a form of insurance. It is a contract between the municipality and the police officer. To the extent that Defendants construe conditions effecting waiver in addition to those specifically named in the statute, the standard for analyzing compliance is set out in *Porter v. Traders' Ins. Co. of Chicago,* 164 N.Y. 504, 58 N.E. 641 (1900).

In *Porter,* a fire insurance policy had been secured on the steamer William Harrison just two months before the ship was "totally destroyed by fire." *Id.* at 506, 58 N.E. 641. One condition of the policy required the insured to "submit to examination under oath." *Id.* At the examination, the policy holders refused to answer one question: "How much was paid for the steamer?" *Id.* Where the policy holders appeared for the examination in compliance with the policy, the court found that their refusal to answer one question amounted to no more than a "technical or unimportant omission.... When a substantial performance is shown, the party claiming the benefit of the contract should not be defeated for the want of a literal compliance as to some unimportant detail." *Id.* at 509, 58 N.E. 641. Furthermore, "[t]he liability of the defendant having become fixed by the happening of the event upon which the contract was to mature, conditions which prescribe *methods and formalities* ... are not to be subjected to any narrow or technical construction, but construed liberally in favor of the insured." *Id.* (emphasis added). The court held that the burden was on the defendant "to show that the insured violated the conditions of the policy in some substantial and material particular ." *Id.* at 507, 58 N.E. 641.

Subsequent decisions in New York have reinforced the assertion in *Porter* that "the duty of the insured to cooperate with the insurer is satisfied by substantial compliance." *Syd's Decorators Inc. v. New York Prop. Ins. Underwriting Assoc.,* 97 A.D.2d 722, 468 N.Y.S.2d 631, 633 (1st Dep't 1983); *see also Lentini Bros. Moving & Storage v. New York Property Ins. Underwriting Assoc.,* 53 N.Y.S.2d 835, 836, 440 N.Y.S.2d 174, 422 N.E.2d 819 (1981); *Bonus Warehouse, Inc. v. Great Atlantic Ins. Co.,* 93 A.D.2d 615, 616, 462 N.Y.S.2d 672 (2d Dep't 1983); *DePicciotto Corp. v. Wallis,* 177 A.D.2d 327, 575 N.Y.S.2d 881 (1st Dep't 1991). To amount to a breach, the attitude of the [in]sured must be one of "willful and avowed obstruction." *American Surety Co. of N.Y. v. Diamond,* 1 N.Y.2d 594, 597, 154 N.Y.S.2d 918, 136 N.E.2d 876 (1956) (quoting *Coleman v. New Amsterdam Cas. Co.,* 247 N.Y. 271, 160 N.E. 367).

Under *Porter et al.,* it would appear that Gentile's failure to make his doctors bill Defendants directly constitutes a mere "technical or unimportant omission" not constituting a breach. Defendants' liability to pay Gentile's medical costs became "fixed" when Gentile suffered work-related injuries, complied with medical examinations and accepted treatment. The collection clause of § 207 sets forth "methods and formalities" which should be "liberally construed" in favor of Gentile—especially in view of the fact that Orangetown accepted Gentile's payment requisitions for a period of years (the exact number is not specified in the record)—before objecting to his paying his doctor directly. *Porter,* 164 N.Y. at 509, 58 N.E. 641; *see also Crawford,* 152 A.D.2d 382, 548 N.Y.S.2d 734.

## II. Defendants Must "Stand or Fall" on their Original Defense

Regardless of the outcome of the waiver analysis, Defendants have not preserved their right to argue that plaintiff's payment of his physicians constitutes a

waiver of his right to reimbursement. An insurance company that refuses to pay out benefits on one ground must "stand or fall on the defense upon which it based its refusal to pay. It may not thereafter attempt to create other grounds for refusal to pay by demanding compliance by the insured with other incidental provisions of the policy with which it had not demanded compliance prior to its repudiation of liability." *Beckley v. Otsego County Farmers Co-op. Fire Ins. Co.,* 3 A.D.2d 190, 194, 159 N.Y.S.2d 270 (3d Dep't 1957).

The instant case falls squarely under *Beckley.* Gentile claims he has always paid his doctors directly and that Defendants reimbursed him for those payments for some time. Since the first lawsuit, however, Defendants have delayed Gentile's claims on other grounds (lack of information, for example), reassured him that reimbursement was forthcoming, before denying him reimbursement on the grounds of waiver. Moreover, despite the alleged waiver, defendants reimbursed plaintiff in part after he filed this suit. Not only have Defendants opted to "stand or fall" on a *wide variety of defenses* over the years, they now demand compliance with the collection clause that they completely ignored until Gentile won his first suit. *See Beckley,* 3 A.D.2d at 194, 159 N.Y.S.2d 270. Under *Beckley,* Defendants have effected the only legitimate waiver in this case; they have no basis to challenge liability.

III. Dismissal for Failure to Meet Discovery Demands Is Not Warranted Here

In the alternative, Defendants allege that Gentile failed to follow the discovery schedule for this case set by Magistrate Judge Fox, and they move to dismiss the complaint on that basis. However, dismissal for failure to follow discovery rules

is discretionary, and I find that such a drastic remedy is not warranted here. *See Societe Internationale Pour Participations Industrielles v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

█ Plaintiff in *Societe,* a Swiss holding company, brought an action against the United States government for the return of property allegedly wrongfully seized during World War II. *See id.* The complaint was dismissed with prejudice when the plaintiff failed to procure certain Swiss bank records, the production of which would have violated Swiss law and could have resulted in criminal sanctions against the plaintiff. *Id.* at 200, 78 S.Ct. 1087. In determining that dismissal of a complaint for failure to meet discovery demands was within the discretion of the District Court, the Supreme Court nevertheless held that such discretion was exercised improperly where the plaintiff reasonably feared criminal sanctions. *Id.* at 209, 357 U.S. 197. "[T]here are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Id.*

█ By contrast, refusal to comply with discovery demands for fear of criminal prosecution where no real potential for criminal prosecution exists constitutes the kind of willful bad faith warranting dismissal. *See General Dynamics Corp. v. Selb Manufacturing Co.,* 481 F.2d 1204 (8th Cir.1973).

Relying on the reasoning of the Court in *Societe,* the Fifth Circuit held that dismissal for failure to meet discovery demands was "predicated upon the presence of such factors as willful disobedience, gross indifference to the right of the adverse party, deliberate callousness, or gross negligence." *Dorsey v. Academy Moving & Storage, Inc.,* 423 F.2d 858 (5th Cir.1970).

In *Dorsey*, the widow of well-known band leader Tommy Dorsey sued Academy Moving when certain first edition recordings of her husband's music did not arrive with the rest of her belongings in shipment from Florida to California. *Id.* In discovery, Academy demanded an extremely detailed description of each missing recording, a demand which Mrs. Dorsey was only partially able to meet by the return date. *Id.* The court held that she and her attorney had made "diligent and extensive efforts" to comply with the demand, and therefore dismissal for failure to meet the deadline was unwarranted. *Id.* at 860.

Applying the reasoning of *Societe, Dorsey,* and *General Dynamics* to the instant case, I find no "willful disobedience" or "gross neglect of the rights of the other party" warranting dismissal here. It is true that Gentile's attorney, Maureen McNamara, failed to supply Defendants' attorney, Joseph Maria with the documents he requested by the return date indicated on Judge Fox's discovery schedule. However, all requested documents were provided to Mr. Maria within two weeks of that date, a fact which, similar to *Dorsey,* suggests a diligent effort to comply. In addition, Ms. McNamara has consistently met her obligations to her client, to this Court and to opposing counsel, notwithstanding two timely requests for adjournment of conferences written from her hospital bed. There simply has been no "willful disobedience" or "gross neglect", and Defendant's Motion to Dismiss on that basis would have been denied regardless of the outcome of the summary judgment analysis.

## CONCLUSION

Defendants' motion for summary judgment, obviously must be denied. The question is whether to grant partial summary judgment in favor of plaintiff on the issue of liability.

I am inclined to grant partial summary judgment to plaintiff on the issue of liability, for the reasons set forth above. However, the better part of valor is to give defendants ten days from the date of this order to apprise the Court, by letter, of any flaw in the Court's reasoning on Parts I and II above. If defendants are unable to rebut both of these arguments, I will grant partial summary judgment to plaintiff on the issue of liability.

This constitutes the decision and order of the Court.